UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GERARD PINEAU, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>  v.<br><br>COVENANT HEALTH, INC.,<br><br>    Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Gerard Pineau ("Plaintiff") brings this Class Action Complaint against Defendant Covenant Health, Inc. ("Defendant" or "Covenant"), individually and on behalf of all others similarly situated, and alleges, upon personal knowledge, counsel's investigation, and information and belief, as follows:

## **INTRODUCTION**

1.     Plaintiff brings this class action against Defendant Covenant Health, Inc. for its failure to properly secure and safeguard Plaintiff's and other similarly situated current and former patients' ("Class Members," defined *infra*) sensitive information, including personally identifiable information ("PII") like names, addresses, dates of birth, and Social Security numbers, and protected health information ("PHI") like health insurance information, medical record numbers, and treatment information, such as diagnoses and dates/types of treatment (PHI and PII together, "Private Information").[1]

2.     Healthcare entities that handle PII and PHI owe a non-delegable duty to the individuals to whom that data relates. This duty arises because it is foreseeable that its exposure to

---

[1] *See Covenant Health, Inc. - Data Breach Notifications*, OFFICE OF THE ME. ATT'Y GEN., https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/2637476a-ce93-46b9-a8c9-e2705955dc98.html (last visited Jan. 2, 2026).

unauthorized persons—especially to hackers with nefarious intentions—will result in harm to the individuals to whom the information relates.

3.    The harm resulting from a data breach manifests in a number of ways, including identity theft and financial or medical fraud. The exposure of a person's PII or PHI through a data breach ensures that such person will be at a substantially increased and certainly impending risk of identity theft crimes compared to the rest of the population, potentially for the rest of their lives. Mitigating that risk requires individuals to devote significant time and money to closely monitor their credit, financial accounts, health records, and email accounts, and take additional prophylactic measures.

4.    Defendant Covenant is a Massachusetts-based health network that offers a broad spectrum of care and services. It operates three care hospitals, two independent living facilities, four assisted care facilities, ten skilled nursing facilities, 100 physician practices and clinics, and employs over 5,500 individuals.[2]

5.    By obtaining, collecting, using, and deriving a benefit from the Private Information of Plaintiff and Class Members, Covenant assumed a resulting duty to secure, maintain, protect, and safeguard the Private Information with which it was entrusted against unauthorized access and disclosure through adequate security measures. Covenant is also aware that PII and PHI are highly valuable to cybercriminals, making it foreseeable that Covenant would be the target of a cyberattack.

6.    Despite Covenant's duty to safeguard the PII and PHI with which it was entrusted, and the foreseeability of a data breach, Plaintiff's and Class Members' Private Information stored

---

[2] *Who We Are*, COVENANT HEALTH, https://covenanthealth.net/who-we-are/ (last visited Jan. 2, 2026).

by Covenant was accessed and acquired when it experienced a cyber security incident beginning on May 18, 2025 (the "Data Breach"). The Data Breach was not discovered until May 26, 2025, and it led to unauthorized access to Covenant's computer systems.[3]

7.    Covenant did not report the Data Breach until July 2025, when it notified the Maine Attorney General's Office that it had experienced a breach resulting in the unauthorized access of the PII and PHI of 7,800 individuals. On December 31, 2025, Covenant updated its notification, revealing that the Data Breach actually impacted over 478,000 individuals.[4]

8.    As a direct and proximate result of Covenant's failure to implement and follow basic, standard security procedures, Plaintiff's and Class Members' PII and PHI have been compromised by cybercriminals and disclosed to unauthorized persons. Plaintiff and Class Members have suffered harm and remain at a significantly increased and certainly impending risk of fraud, identity theft, misappropriation of health insurance benefits, intrusion of their health privacy, and similar forms of criminal activity—risks which may last for the rest of their lives. Consequently, Plaintiff and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

9.    Defendant disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, or negligently failing to implement and maintain adequate and reasonable measures to ensure that the Private Information of Plaintiff and Class Members was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies, and procedures regarding the encryption

---

[3] Eduard Kovacs, *Covenant Health Data Breach Impacts 478,000 Individuals*, SECURITYWEEK (Jan. 2, 2026), https://www.securityweek.com/covenant-health-data-breach-impacts-478000-individuals/.
[4] *Id.*

of data, even for internal use. As a result, the Private Information of Plaintiff and Class Members was compromised through disclosure to an unknown and unauthorized third party.

10.    Plaintiff brings this action on behalf of all persons whose Private Information was compromised as a result of Defendant's failure to: (i) adequately protect the Private Information of Plaintiff and Class Members; (ii) warn Plaintiff and Class Members of Defendant's inadequate information security practices; and (iii) effectively secure its network containing protected Private Information using reasonable and effective security procedures free of vulnerabilities and incidents. Defendant's conduct amounts to negligence and violates federal and state statutes.

11.    Plaintiff and Class Members have suffered injuries as a result of Defendant's conduct. These injuries include: (i) invasion of privacy; (ii) lost or diminished value of Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) an increase in spam calls, texts, and/or emails; and (vi) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information. Plaintiff seeks to remedy these harms and prevent any future data compromise on behalf of Plaintiff and all similarly situated persons whose Private Information was compromised and stolen as a result of the Data Breach and who remain at risk due to Defendant's inadequate data security practices.

12.    Plaintiff, individually and on behalf of the Class, bring claims against Defendant for negligence, breach of fiduciary duty, breach of implied contract, and unjust enrichment, and

seeks declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## PARTIES

11.    Plaintiff Gerard Pineau is, and at all relevant times was, a resident and citizen of the state of Maine.

12.    Defendant Covenant is a Massachusetts corporation with its principal place of business located at 40 Shattuck Road, Suite 317, Andover, Massachusetts 01810.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class, as defined below, is a citizen of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

14.    This Court has personal jurisdiction over Defendant Covenant Health, Inc. because it is incorporated under the laws of the Commonwealth of Massachusetts and maintains its principal place of business in Massachusetts.

15.    Venue properly lies in this District pursuant to 28 U.S.C. § 1391(b) because, *inter alia*, Defendant Covenant resides in this District; and a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

**A.  Defendant Collected and Stored Plaintiff's and Class Members' PII and PHI**

16.     Defendant Covenant is a large healthcare system based in Andover, Massachusetts, which operates healthcare facilities Maine, Massachusetts, New Hampshire, Pennsylvania, Rhode Island, and Vermont.[5]

17.     Covenant provides a myriad of healthcare services, at all levels, including primary, specialty, and urgent care, as well as behavioral health services. It also provides independent and assisted living communities for seniors, hospice care, as well as rehabilitative care.[6]

18.     In the regular course of its business, Covenant collects and maintains the PII/PHI of its patients, former patients, and other persons to whom it is currently providing or previously provided health-related services.

19.     Covenant requires patients to provide it with personal information before it provides treatment at its facilities. That information includes names, addresses, dates of birth, and Social Security numbers, and health insurance information, as well as information regarding prior care, such as medical record numbers and treatment information, including diagnoses and dates/types of treatment. Covenant stores this information digitally.

20.     Covenant, during the regular course of administering services, receives, creates, maintains, and handles its patients' PII and PHI. This information includes, *inter alia*, individuals' names, dates of birth, address, SSNs, health insurance identification numbers and other health insurance information, as well as treatment information including diagnoses, provider information, treatments/procedures, and date(s) of service.

---

[5] *Where We Serve*, COVENANT HEALTH, https://covenanthealth.net/where-we-serve/ (last visited Jan. 2, 2026).
[6] *Care We Offer*, COVENANT HEALTH, https://covenanthealth.net/care-we-offer/ (last visited Jan. 2, 2026).

21.     Plaintiff and Class Members entrusted Covenant with their sensitive and confidential PII and PHI and, therefore, reasonably expected that Covenant would safeguard their highly sensitive PII and keep their PHI confidential.

22.     Due to the sensitivity of the PII and PHI that Covenant handles, collects, and stores, Covenant was aware of its critical responsibility to safeguard this information—and, therefore, how devastating its theft is to individuals whose information has been stolen.

23.     By requesting, obtaining, collecting, storing, and deriving benefits from Plaintiff's and Class Members' PII and PHI, Covenant assumed equitable and legal duties to safeguard and keep confidential Plaintiff's and Class Members' highly sensitive information, to only use this information for business purposes, and to only make authorized disclosures.

24.     Covenant's Privacy Policy page states, "Covenant Health is committed to protecting the confidentiality of your health information and meeting the standards set forth in [HIPAA] regulations."[7] Covenant's HIPAA Notice of Privacy Practices states that it is "required by law to maintain the privacy and security of your protected health information[,]" and that it "will let you know *promptly* if a breach occurs that may have compromised the privacy or security of your information."[8]

25.     Despite Covenant's representations and the existence of these duties, it failed to implement reasonable data security measures to protect Plaintiff's and Class Members' PII and

---

[7] *Privacy Policy*, COVENANT HEALTH, https://covenanthealth.net/privacy-policy/ (last visited Jan. 2, 2026).

[8] *See*, *e.g.*, *Notice of Privacy Practices for Patients*, ST. MARY'S HEALTH SYSTEM (A MEMBER OF COVENANT HEALTH), https://stmarysmaine.com/wp-content/uploads/2025/01/Poster_HIPAA-Notice_SML.pdf (last visited Jan. 2, 2026); *Notice of Privacy Practices for Patients*, ST. JOSEPH HEALTHCARE (A MEMBER OF COVENANT HEALTH), https://stjosephbangor.org/wp-content/uploads/2025/01/Poster_HIPAA-Notice_SJB.pdf (last visited Jan. 2, 2026) (emphasis added).

PHI and ultimately allowed threat actors to compromise Plaintiff's and Class Members' PII and PHI.

**B. The Risks of Storing Valuable PII and PHI Are Well Known in the Healthcare Industry**

26.     Given its frequent handling of sensitive data, Covenant was aware at all relevant times that the PII and PHI that it obtains, collects, stores, uses, and derives a benefit from is highly sensitive and is of significant value to those who seek to use it for wrongful purposes.

27.     Covenant also knew that a breach of its data systems, and the exposure of the information stored therein, would result in the imminent risk of identity theft and fraud for the individuals whose PII and PHI were compromised, as well as intrusion into their highly private health information.

28.     These risks are not theoretical; in recent years, data breaches at healthcare companies have become ubiquitous, with a new breach seemingly announced every few days.[9] The slew of healthcare data breaches over the last few years has surely put Covenant on notice that its electronic records will be targeted by cybercriminals.

29.     PII and PHI have considerable value and constitute enticing and well-known targets for hackers. Hackers can easily sell stolen data, as there has been a "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[10] PHI, in addition to being of a highly personal and private nature, can be used for medical fraud and to submit false medical claims for reimbursement.

---

[9] *See generally* Steve Alder, *Healthcare Data Breach Statistics*, HIPAA Journal, https://www.hipaajournal.com/healthcare-data-breach-statistics/ (Apr. 17, 2025).
[10] Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/.

30.    The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the United States. In 2023, there were 6,077 recorded data breach incidents, exposing seventeen billion records. The United States specifically saw a 19.8% year-over-year increase in data breaches as compared to 2022.[11]

31.    In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2017, 2.9 million people reported some form of identity fraud compared to 5.7 million people in 2021.[12]

32.    The healthcare industry in particular has become a prime target for threat actors: "High demand for patient information and often-outdated systems are among the nine reasons healthcare is now the biggest target for online attacks."[13] Indeed, "[t]he IT environments of healthcare organizations are often complex and difficult to secure. Devices and software continue to be used that have reached end-of-life, as upgrading is costly and often problematic. Many healthcare providers use software solutions that have been developed to work on specific—and now obsolete—operating systems and cannot be transferred to supported operating systems."[14]

33.    Cybercriminals seek out PHI at a greater rate than other sources of personal information. Between 2009 and 2024, 6,759 healthcare data breaches of 500 or more individuals

---

[11] *2024 Global Threat Intelligence Report*, Flashpoint (Feb. 29, 2024), https://go.flashpoint.io/2024-global-threat-intelligence-report-download.

[12] *Insurance Information Institute, Facts & Statistics: Identity Theft and Cybercrime*, Insurance Information Institute, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20 (last visited May 6, 2025).

[13] *The Healthcare Industry is at Risk*, SwivelSecure https://swivelsecure.com/solutions/healthcare/healthcare-is-the-biggest-target-for-cyberattacks/ (last visited May 6, 2025).

[14] Steve Alder, Editorial: *Why Do Criminals Target Medical Records*, HIPAA Journal (Oct. 14, 2022), https://www.hipaajournal.com/why-do-criminals-target-medical-records.

have been reported to Health and Human Services' Office of Civil Rights. Those breaches have resulted in the exposure of 846,962,011 individuals, which equates to more than 2.6 times the population of the United States.[15]

34.    In fact, "[a]n unwanted record was set in 2023 with 725 large security breaches in healthcare reported to the Department of Health and Human Services Office for Civil Rights, beating the record of 720 healthcare security breaches set the previous year."[16] In 2023 alone, about one-third of Americans were affected by health-related data breaches.[17]

35.    "In 2024, the protected health information of 276,775,457 individuals was exposed or stolen. On average, that is 758,288 records per day[.]"[18]

36.    The breadth of data compromised in the Data Breach here makes the information particularly valuable to cybercriminals and leaves Plaintiff and Class Members especially vulnerable to medical fraud, identity theft, tax fraud, credit and bank fraud, and more.

37.    **Social Security Numbers**—Unlike credit or debit card numbers in a payment card data breach—which can quickly be frozen and reissued in the aftermath of a breach—unique SSNs cannot be easily replaced. Even when such numbers are replaced, the process of doing so results in major inconvenience to an individual, requiring a wholesale review of the person's relationships with government agencies and any number of private companies in order to update the person's accounts with those entities.

---

[15] *Krebs*, *supra* note 10.
[16] Steve Alder, *Security Breaches in Healthcare in 2023*, The HIPAA Journal (January 31, 2024), https://www.hipaajournal.com/wp-content/uploads/2024/01/Security_Breaches_In_Healthcare _in_2023_by_The_HIPAA_Journal.pdf.
[17] Ken Alltucker, *Health Care Data Breaches Hit 1 in 3 Americans Last Year: Is Your Data Vulnerable?*, USA Today (Feb. 19, 2024), https://www.usatoday.com/story/news/ health/2024/02/18/health-data-breaches-hit-new-record-2023/72507651007/.
[18] *Krebs*, *supra* note 10.

38.     The Social Security Administration warns that the process of replacing a SSN is a difficult one that creates other problems, and that it will not be a panacea for the affected person:

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.
>
> If you receive a new Social Security Number, you should not be able to use the old number anymore.
>
> For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make it more difficult for you to get credit.[19]

39.     SSNs allow individuals to apply for credit cards, student loans, mortgages, and other lines of credit—among other services. Often SSNs can be used to obtain medical goods or services, including prescriptions. They are also used to apply for a host of government benefits. Access to such a wide range of assets makes SSNs a prime target for cybercriminals and a particularly attractive form of PII to steal and then sell.

40.     **Healthcare Records**—As indicated by Jim Trainor, former second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60 or $70."[20] A complete identity theft kit that includes health insurance

---

[19] *Identify Theft and Your Social Security Numbers*, Social Security Admin. (June 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.

[20] *You Got It, They Want It: Criminals Targeting Your Private Healthcare Data*, *New Ponemon Study Shows*, IDX (May 14, 2015), https://www.idexpertscorp.com/knowledge-center/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat.

credentials may be worth up to $1,000 on the black market, whereas stolen payment card information sells for about $1.[21]

41.     Indeed, medical records "are so valuable because they can be used to commit a multitude of crimes. Healthcare data can be used to impersonate patients to obtain expensive medical services, Medicare and Medicaid benefits, healthcare devices, and prescription medications. Healthcare records also contain the necessary information to allow fraudulent tax returns to be filed to obtain rebates."[22]

42.     "In contrast to credit card numbers and other financial information, healthcare data has an incredibly long lifespan and can often be misused for long periods undetected. Credit card companies monitor for fraud and rapidly block cards and accounts if suspicious activity is detected, but misuse of healthcare data is harder to identify and can be misused in many ways before any malicious activity is detected. During that time, criminals can run up huge debts—far more than is usually possible with stolen credit card information."[23]

43.     According to Experian:

> Having your records stolen in a healthcare data breach can be a prescription for financial disaster. If scam artists break into healthcare networks and grab your medical information, they can impersonate you to get medical services, use your data [to] open credit accounts, break into your bank accounts, obtain drugs illegally, and even blackmail you with sensitive personal details.
>
> ID theft victims often have to spend money to fix problems related to having their data stolen, which averages $600 according to the FTC. But security research firm Ponemon Institute found that healthcare identity theft victims spend nearly $13,500 dealing with their hassles, which can include the cost

---

[21] *Managing Cyber Risks in an Interconnected World, Key Findings from The Global State of Information Security® Survey 2015*, PriceWaterhouseCoopers, https://www.pwc.com/gx/en/consulting-services/information-security-survey/assets/the-global-state-of-information-security-survey-2015.pdf (last visited Feb. 24, 2025).
[22] Adler, *supra* note 16.
[23] *Id.*

of paying off fraudulent medical bills.

Victims of healthcare data breaches may also find themselves being denied care, coverage or reimbursement by their medical insurers, having their policies canceled or having to pay to reinstate their insurance, along with suffering damage to their credit ratings and scores. In the worst cases, they've been threatened with losing custody of their children, been charged with drug trafficking, found it hard to get hired for a job, or even been fired by their employers.[24]

44.    Even if stolen PII and PHI does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Indeed, even when cybercriminals do not gain access to a complete set of an individual's PII and PHI during a data breach, cybercriminals can cross-reference two or more sources of PII and PHI to marry data available elsewhere with criminally stolen data, resulting in complete and accurate dossiers on individuals. These dossiers are known as "Fullz" packages.

45.    The development of Fullz packages means stolen PII from a data breach can easily be linked to victims' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information (such as emails, phone numbers, or credit card numbers) is not included in the PII stolen in a specific incident, criminals can easily create a Fullz package that links that information together and sell the package at a higher price.

46.    Importantly, once a cybercriminal has a Fullz package, they can use it to commit a host of criminal acts including: credit card fraud, loan fraud, identity fraud, account take-overs, medical identity fraud, tax refund fraud, and buy now pay later frauds.[25] Most problematic,

---

[24] Brian O'Connor, *Healthcare Data Breach: What to Know About them and What to Do After One*, Experian (June 14, 2018), https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/.
[25] Paige Tester, *What Are Fullz? How Hackers and Fraudsters Obtain and Use Fullz*, DATADOME (Mar. 3, 2024), https://datadome.co/guides/account-takeover/what-are-fullz-how-do-fullz-work/.

however, is that cybercriminals in possession of a Fullz package "are difficult to stop with ordinary online security and ID verification measures because they possess all the information needed to get past typical authentication measures."[26]

47.    Based on the value of individuals' PII and PHI to cybercriminals, and the foreseeability of a data breach, Defendant knew or should have known the importance of safeguarding the PII and PHI entrusted to it and of the foreseeable consequences that would arise if its data security systems were breached. Defendant failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

### C.  Covenant Breached Its Duties to Protect PII and PHI

48.    As noted above, in July 2025, Covenant announced that it had experienced a cybersecurity incident that led to unauthorized access to its computer systems.[27]

49.    Despite discovering the Data Breach in May 2025, Covenant waited approximately two months to announce that individuals' PII and PHI had been compromised. However, this notice only concerned approximately 7,800 individuals, just 1.6% of the over 478,000 individuals ultimately affected.[28]

50.    It was not until December 31, 2025, seven months after the Breach, that Covenant began notifying *all* affected individuals and notifying the requisite authorities.[29]

51.    In its July Notice, Covalent describes the circumstances surrounding the Data Breach as follows[30]:

---

[26] *Protection Against Fullz and Fraud*, INTEGRITY (Apr. 18, 2022), https://integrity.aristotle.com/2022/04/protection-against-fullz-and-fraud/.
[27] *Notice of Data Security Incident*, COVENANT HEALTH (July 11, 2025), https://covenanthealth.net/cybersecurity/.
[28] *Kovacs*, *supra* note 3.
[29] *Id.*
[30] *Notice of Data Security Incident*, *supra* note 27.

> Covenant Health was alerted to unusual activity in our Information Technology ("IT") environment. We immediately worked to secure and restore our systems and engaged industry-leading third-party information technology and forensic specialists to conduct a thorough investigation into the source and extent of the incident, including the amount and type of data that may have been affected. Through that investigation, we learned that an unauthorized party gained access to our IT environment on May 18, 2025, and was able to access some patient information.

52. Covenant indicated that a wide variety of PII and PHI was compromised in the Data Breach, including, *inter alia*, individuals' names, dates of birth, addresses, SSNs, health insurance identification numbers and other health insurance information, and treatment information including diagnoses, treatments/procedures, and date(s) of service.[31]

53. The PII and PHI of 478,000 individuals were affected by the Data Breach.[32]

54. Based on reports, cybercriminals intentionally accessed Covenant's computer systems in an attack designed to access Plaintiff's and Class Members' valuable PII and PHI stored therein, and these malicious actors were successful in the attack. In June 2025, the ransomware group known as Qilin claimed responsibility for the Breach and indicated that it had stolen 852 GB of data:[33]



---

[31] *Id.*
[32] OFFICE OF THE ME. ATT'Y GEN., *supra* note 1.
[33] Ionut Ilascu, *Covenant Health Says Data Breach Impacted Nearly 478,000 Patients*, BLEEPING COMPUTER (Jan. 2, 2026), https://www.bleepingcomputer.com/news/security/covenant-health-says-may-data-breach-impacted-nearly-478-000-patients/.

55.     As a direct and proximate result of Covenant's failure to implement and maintain adequate security measures, Plaintiff's and Class Members' PII and PHI were exposed to unknown, malicious actors during the Data Breach. It will be nearly impossible for Plaintiff and the Class to ensure that their stolen PII and PHI have been secured and not further disseminated.

**D.  Covenant Failed to Comply With Industry Standards**

56.     Covenant is prohibited by the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45 from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

57.     The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[34]

58.     In 2016, the FTC updated its publication titled "Protecting Personal Information: A Guide for Business," which established cyber-security guidelines for businesses.[35] The guidelines recommend that businesses implement the following:

a.   Businesses should promptly dispose of personal identifiable information that is no longer needed, and retain sensitive data "only as long as you have a business reason to have it;"

---

[34] *See* Federal Trade Commission, *Start with Security: A Guide for Business* (June 2015), available at: https://www.ftc.gov/tips-advice/business-center/guidance/start-security-guide-business.

[35] *See* Federal Trade Commission, *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (Oct. 2016), available at: https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.

    b.   Businesses should encrypt sensitive personal information stored on computer networks so that it is unreadable even if hackers are able to gain access to the information;

    c.   Businesses should thoroughly understand the types of vulnerabilities on their network and how to address those vulnerabilities;

    d.   Businesses should install intrusion detection systems to promptly expose security breaches when they occur; and

    e.   Businesses should install monitoring mechanisms to watch for large troves of data being transmitted from their systems.[36]

59.    In another publication, the FTC recommended that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[37]

60.    Notably, the FTC treats the failure to employ reasonable data security safeguards as an unfair act or practice prohibited by Section 5 of the FTC Act. Indeed, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section

---

[36] *Id.*

[37] *See Start with Security: A Guide for Business*, Federal Trade Commission (June 2015), available at https://www.ftc.gov/tips-advice/business-center/guidance/start-security-guide-business.

5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

61.     Upon information and belief, Defendant failed to properly implement one or more of the basic data security practices recommended by the FTC. Defendant's failure to employ reasonable and appropriate data security measures to protect against unauthorized access to individuals' PII and PHI constitutes an unfair act or practice prohibited by Section 5 of the FTC Act.

62.     Similarly, the U.S. Government's National Institute of Standards and Technology ("NIST") provides a comprehensive cybersecurity framework that companies of any size can use to evaluate and improve their information security controls.[38]

63.     NIST publications include substantive recommendations and procedural guidance pertaining to a broad set of cybersecurity topics including risk assessments, risk management strategies, access controls, training, data security controls, network monitoring, breach detection, and incident response.[39] Upon information and belief, Defendant failed to adhere to the NIST guidance.

64.     Further, cybersecurity experts have identified various best practices that should be implemented by entities in the healthcare sector, including implementing the following measures to defend against common cyberattacks:

    a.   Email protection systems and controls;

    b.   Endpoint protection systems;

---

[38] *See Framework for Improving Critical Infrastructure Cybersecurity*, National Institute of Standards & Technology (Apr. 16, 2018), App'x A, Table 2, available at https://nvlpubs.nist.gov/nistpubs/cswp/nist.cswp.04162018.pdf.
[39] *Id.* at Table 2, 26–43.

c.  Identify all users and audit their access to data, application, systems, and endpoints;

d.  Data protection and loss prevention measures;

e.  IT asset management;

f.  Network management;

g.  Vulnerability management;

h.  Security operations center & incident response; and

i.  Cybersecurity oversight and governance policies, procedures, and processes.[40]

65.  Upon information and belief, Defendant's failure to protect massive amounts of PII and PHI is a result of its failure to adopt reasonable safeguards as required by the FTC guidelines, NIST guidance, and industry best practices.

66.  Defendant was aware of its obligations to use reasonable measures to protect individuals' PII and PHI. Defendant also knew it was a target for hackers, as discussed above. Despite understanding the risks and consequences of maintaining inadequate data security, Defendant nevertheless failed to comply with its data security obligations, leading to the compromise of Plaintiff's and Class Members' PII and PHI.

### E.  Plaintiff and Class Members Suffered Damages

67.  For the reasons mentioned above, Covenant's conduct, which allowed the Data Breach to occur, caused Plaintiff and Class Members significant injuries and harm in several ways. Plaintiff and Class Members have already been caused to and must continue to devote time, energy, and money to: (1) closely monitor their medical statements, bills, records, and credit and financial accounts; (2) change login and password information on any sensitive account even more

---

[40] *HICP's 10 Mitigating Practices*, HHS, https://405d.hhs.gov/best-practices (last visited May 6, 2025).

frequently than they already do; (3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering or spear phishing attack; and (4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

68.     Once PII and PHI are exposed, there is virtually no way to ensure that the exposed information has been fully recovered or protected against future misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly for their entire lives, as a result of Defendant's conduct. Further, the value of Plaintiff's and Class Members' PII and PHI has been greatly diminished by its exposure in the Data Breach.

69.     As a result of Covenant's failures, Plaintiff and Class Members are also at a substantially increased risk of identity theft, fraud, phishing attacks, and related cybercrimes following the Data Breach. Those who are affected experience heightened and prolonged anxiety and fear, as they will be at risk of falling victim to cybercrimes for years to come.

70.     With respect to data breaches specifically in the healthcare sector, a study has found "the majority [70%] of data impacted by healthcare breaches could be leveraged by hackers to commit fraud or identity theft."[41]

71.     "Actors buying and selling PII and PHI from healthcare institutions and providers in underground marketplaces is very common and will almost certainly remain so due to this data's utility in a wide variety of malicious activity ranging from identity theft and financial fraud to crafting of bespoke phishing lures."[42]

---

[41] Jessica David, *70% of Data Involved in Healthcare Breaches Increases Risk of Fraud*, Health IT Sec. (Sept. 25, 2019), https://healthitsecurity.com/news/70-of-data-involved-in-healthcare-breaches-increases-risk-of-fraud.
[42] *Id.*

72.     The reality is that cybercriminals seek nefarious outcomes from a data breach, and "stolen health data can be used to carry out a variety of crimes."[43]

73.     Health information in particular is likely to be used in detrimental ways. Cybercriminals can leverage sensitive personal health details and diagnoses to extort or coerce the victim and commit serious and long-term identity theft.[44]

74.     "Medical identity theft is a great concern not only because of its rapid growth rate, but because it is the most expensive and time consuming to resolve of all types of identity theft. Additionally, medical identity theft is very difficult to detect which makes this form of fraud extremely dangerous."[45]

75.     Indeed, many victims of medical identity theft are not aware of the theft until long after it occurs; "[s]omeone may apply for a mortgage, for example, and learn their credit is ruined due to unpaid medical bills for care they didn't receive."[46]

76.     Plaintiff and Class Members are at continued risk because their information remains in Covenant's systems, which have already been shown to be susceptible to compromise and attack and are subject to further attack so long as Covenant fails to undertake the necessary and appropriate security and training measures to protect the PII and PHI with which it was entrusted.

---

[43] Andrew Steger, *What Happens to Stolen Healthcare Data?*, HealthTech (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon.
[44] *Id.*
[45] *The Potential Damages & Consequences of Medical Identity Theft & Healthcare Data Breaches*, Experian (Apr. 2010), https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf.
[46] Michelle Andrews, *Someone Could Steal Your Medical Records and Bill You for Their Care*, NPR (July 26, 2023), https://www.npr.org/sections/health-shots/2023/07/26/1189831369/medical-identity-fraud-protect-yourself.

77.     Additionally, Plaintiff and Class Members have suffered emotional distress, increased risk of identity theft and financial fraud, and the unauthorized exposure of their private medical information to strangers as a result of the Data Breach.

### F.  Plaintiff's Experiences

#### *Plaintiff Gerard Pineau*

78.     Plaintiff Gerard Pineau is a patient of Covenant. He provided his PII and PHI directly to Covenant to receive healthcare services.

79.     In requesting, obtaining, collecting, storing, using, and deriving a benefit from Plaintiff's PII and PHI, Covenant undertook a duty to act reasonably in its handling of Plaintiff's PII and PHI. Covenant, however, did not take reasonable care of Plaintiff's PII and PHI, leading to their exposure and compromise as a direct and proximate result of Covenant's inadequate security measures.

80.     To date, Plaintiff Pineau has not received notice from Covenant that his PII and PHI was implicated in the Data Breach.

81.     Plaintiff Pineau is extremely careful with his private information. He stores his important personal documents in a safe and uses a designated credit card for online shopping because he is wary of online merchants having her debit card information.

82.     Since learning of the Breach, Plaintiff Pineau has been required to spend valuable time and effort attempting to mitigate the harm caused by the Data Breach.

83.     As a direct and proximate result of the Data Breach, Plaintiff Pineau has suffered actual injury from having his PII and PHI exposed and/or stolen as a result of the Data Breach, including: (a) efforts to mitigate the risk of misuse of his PII and PHI; (b) damages to and diminution of the value of his PII and PHI, a form of intangible property that loses value when it

falls into the hands of criminals who are using that information for fraud or publishing the information for sale on the dark web; and (c) a loss of privacy.

84.    Further, knowing that hackers accessed and possibly exfiltrated his PII and PHI, and that this information likely has been or will be used in the future for identity theft, fraud, and other nefarious purposes has caused Plaintiff Pineau to experience stress, anxiety, worry, and fear.

85.    As a direct and proximate result of the Data Breach, Plaintiff Pineau has been and will continue to be at a substantial and certainly impending risk for fraud and identity theft and its attendant damages for years to come. Such a risk is real and certainly impending and is not speculative given the highly sensitive nature of the PII and PHI compromised in the Data Breach.

## CLASS ALLEGATIONS

86.    Plaintiff brings this action on behalf of himself and all other similarly-situated individuals pursuant to Fed. R. Civ. P. 23.

87.    Plaintiff seeks to represent a Class of persons to be defined as follows:

All individuals who are residents of the United States whose PII and/or PHI were compromised in the Data Breach, including all persons who received notice of the Data Breach.

88.    Excluded from the Class is Covenant Health, Inc. and its subsidiaries and affiliates, officers and directors, any entity in which Covenant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

89.    The proposed class definition is based on the information available to Plaintiff at this time. Plaintiff may modify the class definition in an amended pleading or when Plaintiff moves

for class certification as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

90.     **Numerosity:** The members of the Classe are so numerous that the joinder of all members is impractical. The exact size of the Class and the identities of the individual members are ascertainable through Covenant's records, including but not limited to the files implicated in the Data Breach. Based on the public information currently available, the Class includes approximately 478,000 individuals. Class Members are ascertainable. Class membership is defined using objective criteria, and Class Members may be readily identified through Covenant's books and records.

91.     **Commonality:** This action involves questions of law and fact common to the Class. Such common questions include but are not limited to:

    a.   Whether and to what extent Defendant had a duty to protect the PII and PHI of Plaintiff and Class Members;

    b.   Whether Defendant was negligent in collecting and storing Plaintiff's and Class Members' PII and PHI, and breached its duties thereby;

    c.   Whether Defendant took reasonable steps and measures to safeguard Plaintiff's and Class Members' PII and PHI;

    d.   Whether Defendant failed to adequately safeguard Plaintiff's and Class Members' PII and PHI;

    e.   Whether Defendant breached its duty to exercise reasonable care in handling Plaintiff's and Class Members' PII and PHI;

f.  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

g.  Whether Plaintiff and Class Members are entitled to damages as a result of Defendant's wrongful conduct; and

h.  Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

92.  **Typicality:** Plaintiff's claims are typical of the claims of Class Members. Plaintiff's and Class Members' claims are based on the same legal theories and arise from the same unlawful and willful conduct. Plaintiff and Class Members each had their PII and PHI exposed and/or accessed by an unauthorized third party.

93.  **Adequacy:** Plaintiff is an adequate representative of the Class. Plaintiff will fairly, adequately, and vigorously represent and protect the interests of the Class Members and has no interests antagonistic to the interests of the Class Members. In addition, Plaintiff has retained counsel who are competent and experienced in the prosecution of class action litigation. The claims of Plaintiff and the Class Members are substantially identical, as explained above.

94.  **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all Class Members is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense, and promote uniform decision-making.

95.     **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages are common to Plaintiff and each member of the Class. If Defendant breached its duty to Plaintiff and Class Members, then Plaintiff and each Class Member suffered damages by that conduct.

96.     Defendant has acted and/or refused to act on grounds that generally apply to the Class making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. R. Civ. P. 23(b)(2).

## CAUSES OF ACTION
### COUNT I
### NEGLIGENCE

97.     Defendant owed a non-delegable duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting PII and PHI relating to Plaintiff and the Class in Defendant's possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

98.     Specifically, this duty included, among other things: (a) designing, maintaining, and testing Defendant's security systems to ensure that Plaintiff's and Class Members' PII and PHI in Defendant's possession was adequately secured and protected; (b) implementing processes that would detect a breach of its security systems in a timely manner; (c) timely acting upon warnings and alerts, including those generated by its own security systems, regarding intrusions to its networks; and (d) maintaining data security measures consistent with industry standards.

99.     Defendant's duty to use reasonable care arose from several sources, including but not limited to those identified below.

100.     Defendant had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of the Defendant. By receiving, maintaining, and handling PII and PHI that are routinely targeted by criminals for unauthorized access, Defendant was obligated to act with reasonable care to protect against these foreseeable threats. Defendant alone controlled its technology, infrastructure, and cybersecurity. Defendant further knew or should have known that if hackers breached its data systems, they would extract sensitive data and inflict injury upon Plaintiff and Class Members. Furthermore, Defendant knew or should have known that if hackers accessed the sensitive data, the responsibility for remediating and mitigating the consequences of the breach would largely fall on individual persons whose data was impacted and stolen. Therefore, the Data Breach, and the harm it caused Plaintiff and Class Members, was the foreseeable consequence of Defendant's unsecure and unreasonable data security measures.

101.     Defendant also owed a common law duty because its conduct created a foreseeable risk of harm to Plaintiff and Class Members. Defendant's conduct included its failure to adequately restrict access to its computer networks that held Plaintiff's and Class Members' PII and PHI.

102.     Defendant's duty also arose from its position as a healthcare business associate and covered entity. Defendant holds itself out as a trusted business associate and a trusted provider of healthcare services, thereby assuming a duty to reasonably protect the information it obtains from its patients and customers. Indeed, Defendant, which receives, maintains, and handles the PII and PHI with which it was entrusted, was in a unique and superior position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

103.    Defendant is subject to an "independent duty," untethered to any contract between Defendant and Plaintiff and Defendant and Class Members. The sources of Defendant's duty are identified above.

104.    Defendant breached the duties owed to Plaintiff and Class Members and thus was negligent. Although the exact methodologies employed by the unauthorized third parties are unknown to Plaintiff at this time, on information and belief, Defendant breached its duties through some combination of the following errors and omissions that allowed the Data Breach to occur: (a) mismanaging its systems and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PII and PHI; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards, key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; and (g) failing to adequately train and supervise employees and third party vendors with access or credentials to systems and databases containing sensitive PII and PHI.

105.    But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, their PII and PHI would not have been accessed and compromised by cybercriminals.

106.    As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered injuries including:

    a.   Theft of their PII and PHI;

b.   Costs associated with requesting credit freezes;

c.   Costs associated with the detection and prevention of identity theft;

d.   Costs associated with purchasing credit monitoring and identity theft protection services;

e.   Lowered credit scores resulting from credit inquiries following fraudulent activities;

f.   Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach;

g.   The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII and PHI being placed in the hands of criminals;

h.   Damages to and diminution in value of their PII and PHI entrusted to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others; and

i.   Continued risk of exposure to hackers and thieves of their PII and PHI, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff and Class Members.

107.   As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

108. In addition to its common law obligations, Defendant owed a duty to Plaintiff and the Class under the FTC Act, 15 U.S.C. § 45(a)(1). Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by entities such as Defendant of failing to use reasonable measures to protect PII and PHI. Various FTC publications and orders also form the basis of Defendant's duty.

109. Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiff's and Class Members' PII and PHI and not complying with the industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII and PHI it obtained and stored and the foreseeable consequences of a data breach involving the PII and PHI it obtained when servicing the healthcare needs of its patients and customers.

110. Plaintiff and Class Members are within the class of persons that Section 5 of the FTC Act is intended to protect.

111. Moreover, the harm that has occurred is the type of harm that Section 5 of FTC Act was intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses that caused the same harm suffered by Plaintiff and Class Members as a result of its failure to employ reasonable data security measures and avoid unfair and deceptive practices.

112. Defendant's violation of Section 5 of the FTC Act constitutes negligence.

113. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered injuries, including those identified above.

114. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have been injured as described herein, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

## COUNT II
## BREACH OF FIDUCIARY DUTY

115.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

116.    Plaintiff and Class Members have an interest, both equitable and legal, in the PII and PHI that was conveyed to, collected by, and maintained by Covenant and that was ultimately accessed or compromised in the Data Breach.

117.    As a healthcare provider, Covenant has a fiduciary relationship to its patients. By providing medical treatment and healthcare services for Plaintiff and the Class, Covenant has a duty to act in good faith and solely for the benefit of Plaintiff and Class Members in all matters related to their healthcare.

118.    Covenant is in possession of individuals' PII, PHI, and confidential medical information that are not generally known. Plaintiff is very careful with PII and PHI and does not disclose PII/PHI of Plaintiff's own accord.

119.    Plaintiff and Class Members neither consented to nor authorized the disclosure of their PII/PHI to a criminal actor.

120.    Defendant Covenant was negligent in the maintenance of its computer systems in which Plaintiff's and Class Members' PII and PHI were stored. Covenant knew, or should have known, that the private information stored in its systems could be exploited at great cost to Plaintiff and the Class.

121.    Plaintiff has suffered concrete injuries as a result of Plaintiff's PII and PHI being exposed in the Data Breach.

122.    Plaintiff has dedicated significant time to monitoring financial accounts, implementing credit freezes, registering for identity theft protection, and dealing with increased

spam communications.. As discussed *supra*, cybercriminals may store individuals' PII and PHI for years before using it for fraudulent activity. After Covenant's offer one year of credit monitoring expires, any credit monitoring services that Plaintiff requires must be purchased out of pocket. Due to the breadth of private information compromised in the Data Breach, Plaintiff may need credit monitoring services for the rest of Plaintiff's life.

123.    Beyond the impending risk of identity or medical fraud, Plaintiff and Class Members have suffered emotional distress from the exposure of their private medical information.

124.    Further, Plaintiff and Class Members have suffered damage to and diminution of the value of their PII and PHI. Individual pieces of private information such as SSNs have an ascertainable monetary value, as evidenced by the prices cybercriminals charge for them.

125.    As a healthcare provider, Covenant breached its fiduciary duty to its patients by, among other things: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PII and PHI; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; (g) failing to follow its own privacy policies and practices published to its patients; and (h) making an unauthorized and unjustified disclosure and release of Plaintiff and the Class Members' PHI and medical records/information to a criminal third party.

126.    Covenant's breach of its fiduciary duty to its patients was a real factor in bringing about Plaintiff's and Class Members' injuries. But for Covenant's failure to properly secure its computer systems, Plaintiff would not be required to spend time, money, and effort to protect themselves from imminent fraud.

127.    In addition to Covenant's duty to keep Plaintiff's and Class Member's information confidential, Covenant failed to safeguard PII and PHI that Plaintiff and the Class had no choice but to provide to receive medical treatment. Plaintiff and the Class were reliant on Covenant for necessary services. The imbalance of power between Plaintiff and Defendant Covenant further indicates that Covenant owed, and subsequently breached, a fiduciary duty to its patients.

128.    As a direct and proximate result of Covenant's breach of its fiduciary duty, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, and/or disgorgement or restitution, in an amount to be proven at trial.

<u>**COUNT III**</u>
**BREACH OF IMPLIED CONTRACT**

129.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

130.    In connection with receiving medical treatment or services, Plaintiff and all other Class Members entered into implied contracts with Covenant.

131.    Pursuant to these implied contracts, Plaintiff and Class Members paid money to Covenant, whether directly or through their insurers, and provided Covenant with their PII/PHI. In exchange, Covenant agreed to, among other things, and Plaintiff understood that Covenant would: (1) provide medical treatment, services, or health plan benefits to Plaintiff and Class Members; (2) take reasonable measures to protect the security and confidentiality

of Plaintiff's and Class Members' PII/PHI; and (3) protect Plaintiff's and Class Members' PII/PHI in compliance with federal and state laws and regulations and industry standards.

132.    The protection of PII/PHI was a material term of the implied contracts between Plaintiff and Class Members, on the one hand, and Covenant, on the other hand. Indeed, as set forth *supra*, Covenant recognized the importance of data security and the privacy of its patients' PII/PHI in its Breach Notification. Had Plaintiff and Class Members known that Covenant would not adequately protect its patients' PII/PHI, they would not have received medical treatment or services from Covenant.

133.    Plaintiff and Class Members performed their obligations under the implied contract when they provided Covenant with their PII/PHI and paid—directly or through their insurers—for health care treatment, services, or health insurance premiums from Covenant.

134.    Covenant breached its obligations under its implied contracts with Plaintiff and Class Members by failing to implement and maintain reasonable security measures, protocols, and procedures to protect and secure Plaintiff's and Class Members' PII/PHI in a manner that complies with applicable laws, regulations, and industry standards.

135.    Covenant's breach of its obligations of its implied contracts with Plaintiff and Class Members directly resulted in the Data Breach and the injuries that Plaintiff and all other Class Members have suffered from the Data Breach.

136.    Plaintiff and all other Class Members were damaged by Covenant's breach of implied contracts because: (i) they paid—directly or through their insurers—for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII/PHI was improperly disclosed to unauthorized

individuals; (iv) the confidentiality of their PII/PHI has been breached; (v) they were deprived of the value of their PII/PHI, for which there is a well-established national and international market; and/or (vi) they lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face.

## COUNT IV
## UNJUST ENRICHMENT

137.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

138.    This claim is pleaded in the alternative to Plaintiff's current and future contract-based claims.

139.    By its wrongful acts and omissions described herein, Defendant has obtained an undue benefit from the PII and PHI entrusted to it by Plaintiff and Class Members.

140.    Covenant was aware of, appreciated, and/or understood the undue benefit it obtained from its transactions with Plaintiff and Class Members.

141.    Defendant Covenant, prior to and at the time Plaintiff and Class Members entrusted their PHI/PII to Covenant for the purpose of obtaining health services, caused Plaintiff and Class Members to reasonably believe that Covenant would keep such PHI/PII and financial information secure.

142.    Covenant was aware, or should have been aware, that Plaintiff and Class Members relied on its representations that the PHI/PII kept in its custody would be secure. Plaintiff and Class Members would not have contracted with Covenant had they known that Covenant's information systems were sub-standard for that purpose.

143.    Covenant also knew or should have known that if Plaintiff and Class Members became aware of the substandard condition of and vulnerabilities in its information systems, Plaintiff and Class Members would be much less likely to seek its services.

144.    Covenant failed to disclose facts pertaining to its substandard information systems before Plaintiff and Class Members made their decisions to seek medical care. Instead, Covenant suppressed and concealed such information for months after the Data Breach occurred. By concealing and suppressing that information, Covenant denied Plaintiff and Class Members the ability to make informed decisions regarding their PHI and PII and received an undue benefit.

145.    Covenant was unjustly enriched at the expense of Plaintiff and Class Members. Covenant received profits, benefits, and compensation, in part, at the expense of Plaintiff and Class Members. By contrast, Plaintiff and Class Members did not receive the benefit of their bargain because they sought healthcare services on the assumption that their private information would be secure in Covenant's possession.

146.    Since Covenant's profits, benefits, and other compensation were obtained by improper means, Covenant is not legally or equitably entitled to retain any of the benefits, compensation or profits it realized from these transactions.

147.    Plaintiff and Class Members seek an Order of this Court requiring Covenant to refund, disgorge, and pay as restitution any profits, benefits and other compensation obtained by Covenant from its wrongful conduct and/or the establishment of a constructive trust from which Plaintiff and Class Members may seek restitution.

## COUNT V
## DECLARATORY JUDGMENT

148.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

149.     Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Class Action Complaint.

150.     An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' PII and PHI. Namely, whether Covenant is currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII and PHI. Plaintiff alleges that Covenant's data security measures remain inadequate. Furthermore, Plaintiff and Class Members continue to suffer injury as a result of the compromise of their PII and PHI and remain at imminent risk that further compromises of their PII and/or PHI will occur in the future.

151.     Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring that, among other things:

a.   Covenant owed a legal duty to secure patients' PII and PHI under common law and Section 5 of the FTC Act; and

b.   Covenant breached and continues to breach these legal duties by failing to employ reasonable measures to secure patients' PII and PHI.

152.     This Court also should issue corresponding prospective injunctive relief requiring Covenant to employ adequate security protocols consistent with law and industry standards to protect Plaintiff's and Class Members' PII and PHI.

153.     If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury and lack an adequate legal remedy in the event of another data breach of Covenant's

systems. The risk of another such breach is real, immediate, and substantial. If another breach of any of Covenant's systems occurs, Plaintiff and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

154.    The hardship to Plaintiff and Class Members if an injunction is not issued exceeds the hardship to Covenant if an injunction is issued. Plaintiff and Class Members will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Covenant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Covenant has a pre-existing legal obligation to employ such measures.

155.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach of Covenant's systems, thus eliminating the additional injuries that would result to Plaintiff, Class Members, and patients whose confidential information would be further compromised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all other members of the Class, prays for relief as follows:

A.    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as a representative of the Class and appointing Class Counsel;

B.    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

C.    For compensatory damages on behalf of Plaintiff and the Class;

D.    For punitive damages on behalf of Plaintiff and the Class;

E.    For an order of restitution and all other forms of equitable monetary relief;

F.    Declaratory and injunctive relief as described herein;

G.    For disgorgement and/or restitution as the Court deems appropriate, just, and proper;

H.    Awarding Plaintiff reasonable attorneys' fees, costs, and expenses;

I.    Awarding pre- and post-judgment interest on any amounts awarded;

J.    For reimbursement for all costs and expenses incurred in connection with the prosecution of these claims; and

K.    Awarding of such other and further relief as may be just and proper.

## JURY TRIAL DEMANDED

A jury trial is demanded on all claims so triable.

Dated:  January 5, 2026                    Respectfully submitted,

*/s/ David Pastor___*
David Pastor (BBO 391000)
*dpastor@pastorlawoffice.com*
**PASTOR LAW OFFICE**
63 Atlantic Avenue, 3rd Floor
Boston, MA 02110
Tel: (617) 742-9700
Fax: (617) 742-9701

Andrew W. Ferich (*pro hac vice* forthcoming)
*aferich@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite 650
Radnor, PA 19087
Telephone: (310) 474-9111
Facsimile: (310) 474-8585

Thomas E. Loeser (admitted *pro hac vice*)
*tloeser@cpmlegal.com*
**COTCHETT PITRE & MCCARTHY LLP**
1809 7th Avenue, Suite 1610
Seattle, WA 98101
Tel: (206) 970-8181